Good morning. May it please the court. My client, Mr. Cory Turner, was convicted of conspiracy to distribute cocaine and other charges, and he is currently serving a life sentence at the United States Penitentiary in Terre Haute. And as the court is aware, he arrived at that sentence after a investigation, indictment, jury trial, and ultimately the judgment and sentence of the district court. And the issue which I wish to raise with the court this morning is it's our position that the government, in conducting its initial investigation of Mr. Turner and the other defendants in this case, improperly gathered information against them using the wiretap statute. And the reason that we argue this is because the government, in making its wiretap applications to the district court and the district courts ultimately ordering the wiretaps, combined different types of evidence allowed the government to gather different types of evidence that are actually governed by statutes other than the wiretap act. Essentially, there's four different tools that investigators can use to investigate in a criminal case when doing surveillance, different chapters. Whose phones are you saying couldn't have been tapped lawfully? Whose phones are you saying couldn't be tapped lawfully? Well, my client, Cory Turner, Sr., is one, target phone number one. And, your honor, what I'm also arguing is there's four ways to gather information. There's the wiretap act, which is 18 U.S.C. 2510 et al. Let me back up a minute. Sure. Was evidence used against Cory Turner from his phone? Yes, it was, your whether he has standing to complain about other phones. But his phone, they used evidence that, at trial, that they obtained on his phone. That's correct. There were numerous conversations from his phone that were used at trial. And, one of the things that I did want to mention to the court is the wiretap orders contained search and seizures orders that are actually encompassed by Rule 41. They also allowed the government to gather stored records and communications, which are actually governed by a separate statute, which is 18 U.S.C. 2701 et al. And, also allowed the government to obtain pen register, trap and trace, and enhanced caller ID, which is governed by 18 U.S.C. 3121. And, what we are arguing, your honor, the wiretap statutes only, or your honors, only allow the court or the government to obtain intercepts. In other words, oral intercepts. And, what they did with the wiretap orders in this case is they basically combined them. They allowed them, the agents, to track my client's phone, to actually track his movements in real time, which is our position, they should have used a Rule 41 warrant for that. So, your position is that they can't combine those? My position is that they cannot, your honor. And, the reason that I'm saying that is because Congress enacted separate statutes for each of these ways of gathering information. There's a stored communications act that deals with stored records. There's a pen register, trap and trace. There's the government did is they combined all these into one document. They did not follow the statutes as set out by Congress. In other words, Congress set out the rules of how you're supposed to gather this information. And, what the government did is they used the wiretap statute and combined all of these methods of gathering surveillance, including real-time GPS of monitoring my client inside his house and private spaces. And, they did so under the not authorized under that act. And, that's what I'm arguing. So, what what is the remedy then? Are you saying everything that was obtained by that warrant is inadmissible or only the, I'll just call it the tracking, the GPS tracking information? I would say that all of it is arguably suppressible. And, under the wiretap act, my client's certainly an agreed person under the wiretap act. He was, his phone was followed. And, since you had a short amount of time, I'll just ask a couple quick more questions. So, are you saying that the wiretap procedures were not followed? Or, are you saying it's not, it should be suppressed because of the other improprieties in collecting all of this into one application and warrant? I would say more so about collecting them all into one application. In other words, the wiretap act was improperly used to gather information governed by other statutes and procedures and safeguards. And, those particular statutes outside of the wiretap act were not followed. They were kind of almost hybrid orders. And, how, so your position is that they could only get the tracking and or the GPS information through a rule 41? That is my position. And, your position is they didn't follow those rules? They did not follow that rule. They did not have, there is such a thing as a rule 41 warrant. I'm sure the court is aware, which is actually a warrant that is, has a return and specifies and reports back with an inventory. My client was monitored in real-time GPS into his house, different places. And, there was no reporting back to the court exactly where he was going, that they were monitoring him and reporting back to the DEA. Agents were reporting to each other and following him. So, again, your honor, we believe these orders violated the statutory authority of the court. Or, the court violated the statute, statutory, statutory authority given to them in doing this. And, they had no authority to issue these types of orders and gather this information. And, for that reason, we ask that the evidence be suppressed and the case be reversed. Thank you. Okay, thank you. Okay, Mr. Fagras? Or, no, no, no. Mr. Humphrey. Okay, sorry. Mr. Humphrey, on behalf of Donald Turner. Thank you, your honor. May it please the court. Obviously, I'm here on behalf of Mr. Turner, who was also convicted of conspiracy to distribute five kilograms or more of cocaine and is now serving a life sentence on the basis of that conviction. I have a number of issues to address and, hopefully, I can get through them as quickly as possible because I also have some issues that my client wanted to address through his pro se brief as well. But, what I wanted to first discuss was to piggyback a little bit upon what Mr. Cohen was saying about the wiretaps themselves. In that, there were, obviously, applications made to the court for wiretaps in this case. And, we believe that under the statute, under 18 U.S.C. 2518, section 10, that there was not the requisite necessity for these wiretaps when they were applied for. Obviously, this is very, very fact-specific and, in essence, walking through how the process works in that the government, the agents, file affidavits. And, they say, they generalize and they summarize what the procedures that they were going through with their investigations. And, as part of that investigation, they mentioned things that they found out and they mentioned that they have a need for additional information. Obviously, at the point where we get the affidavits, the orders have already been made. So, we're kind of working in reverse. And, at that point, also, we don't have full information because, a lot of times, and not that they should have to give up that information at this point, but the affidavits contain information about sources of information, confidential sources, that are not going to be revealed to us at this point. But, we do have an opportunity to look at the investigations. And, looking at this specific investigation, Judge, we would submit that there was not the requisite necessity for a wiretap to ever issue in this case. As a little bit of background, as there was testimony that was elicited in this case, that this has been called the Turner Drug Trafficking Organization. This is an investigation that's allegedly been going on since the late 90s. We even had a motion to suppress, I mean, I'm sorry, a motion eliminate, about not referring to this specifically during testimony as the Turner Drug Trafficking Organization, because we had three clients who were all Turner sitting there. And, that was something that was actually agreed to and granted. So, we have this situation where the Turner Drug Trafficking Organization is being investigated. And, only through the process of going through trial, do we ultimately know that the confidential source in this situation is an individual by the name of Toby Turner. Toby Turner is a cousin of all of the defendants in this case. This was somebody who was working actively with the government. This is somebody who was acting in coordination with the head of the organization, Joe Lindsay Turner. This is somebody who had information about who was involved, what the sources of supply were. He was going on trips with the government. And, essentially, what we have here is a statement that we still want it more. We want it more. We wanted to know more about the sources of supply of drugs. And, that we couldn't have gotten that information without getting these wiretaps. But, then, what I'm left with, Judge, in representing my client, is that, basically, the government gets to act with perfect information. Because, they get to create the affidavits that are presented to the court. And then, they get to also say, once I got those wiretaps, I found out this additional information, which shows that the wiretaps were I have to deal with people who are working with, essentially, perfect information. They have the benefit of hindsight. I can never overcome that burden, as far as this wiretap is concerned. In that situation, where they can say, I have the wiretap. I found out this information. And, now, I can, therefore, show that this wiretap was necessary. But, don't they have to show that up front to get the wiretap? They have to show that there have been some failures in their investigative means. But, they don't have to actually reveal who their sources are. And, that's my point, is that there is no need to fill out the affidavit and say to the magistrate judge, by the way, my confidential source is the cousin of who we think is the suspected head of the organization. There's no need to do that. So, in this essence, I would submit, especially, once we have found out everything that's going on in this situation, that they clearly had more than enough information, through traditional investigative means, to not have to go through the additional burden of getting a wiretap. So, you're saying they had someone in the inner workings of this organization before they ever got the wiretap? Absolutely. Well, who makes that decision about when they have enough evidence? Well, ultimately, ultimately, they do. And, that is... That's my question. Isn't that right? They're the prosecutors to know when to say, okay, we may have enough, but we're not sure. We have to prove beyond a reasonable doubt. There may be reasonable doubt with what we have. We want to go further. There might be other people involved that we don't know about. What was expressed, Judge, is that, essentially, they needed to know more about the structure. They needed to know about involvement. But, I would submit that, based upon who they were working with, they had that brief... I know I'm running short on time. I did want to address the use of the witness, Ms. Dorsey, in order to, essentially, authenticate the wiretaps that were used in this case, in particular, against my client, Mr. Turner, because Ms. Dorsey was, essentially, submitted as almost a quasi-expert, in the sense that she's being put forward as a member of the conspiracy. But, as we know, under the law, Judge, not everyone in the conspiracy has to know each other. So, it's not necessarily, they would not necessarily follow that if you don't have to know everyone involved in the conspiracy, that you would know exactly what someone else who's involved in the conspiracy is talking about, and is what references they're making in a phone conversation. She was used, essentially, to give the jury information about what my client was allegedly saying in a phone call. Here's what I was thinking. You tell me where I'm wrong. Often, you do these kinds of things with a police officer. You put a police officer on the on the stand, and he or she starts telling you what the street language is. But, here, you had someone personally involved in at least some of the conversations saying what was meant. Why isn't that not at least as good, if not better, than putting a police officer in the stand? Because, Your Honor, in this case, I testified that she didn't have an extensive relationship with my client. The majority of her relationship with my client was on the basis that they grew up together. She didn't have any direct dealings with my client, as far as any alleged drug activities. These are things that she said on the stand. Yet, she was used to interpret things that my client was alleged to have said in a telephone conversation. If that testimony had been excluded, would it have affected the strength of the government's case? I do believe so, Judge, in reference to my client, in particular, because the majority of these conversations that were entered into evidence against my client were... Would it have been sufficient to prevent a conviction? Ultimately, Judge, I would suggest, yes, it would, because I believe that what happened here was there was an interference with the province of the jury by allowing this lay witness, who was not tendered as an expert, to give her opinion as to what the content of these calls were, instead of allowing the jury to listen, evaluate, and come to their own conclusion. Okay, thank you. Thank you. Now, Mr. Fagres. Please, the court. My client, Judge, was defended. Antonio Turner, who was convicted, also, of possession with intent to distribute five kilograms of cocaine, and is currently serving a life without release sentence. Mr. Antonio Turner, and I would say, was part of this conspiracy, alleged part of the conspiracy by the government, but in reality, what occurred was we were having two simultaneous trials. Antonio Turner's trial, then Corey Senior Turner, and Donald Turner's trial. The only nexus between Antonio Turner and the rest of the defendants, all of the defendants of the 17 defendant conspiracy, was the last name Turner. The evidence procured by the government and shown at trial about Mr. Turner, Antonio Turner, was that he had made two, or he had made an alleged sale, and he allegedly possessed cocaine. The government showed a video of an arrest of Antonio Turner that occurred on March 11th, 2000, or March 12th, 2011, and it also showed, and they used the testimony of a undercover snitch by the name of Ashley Holland at trial to corroborate that somehow this alleged sale and his alleged possession connected him to this and the possession of this, and that Mr. Antonio Turner was somehow part of a conspiracy with the five kilogram, they had to determine whether or not, what extent did Antonio Turner benefit from the Corey Senior and Donald Turner's actions, and also whether he showed a substantial, Antonio Turner showed a messages on a phone in which he was making a buy, allegedly using code word ticket. This is what the government was offering, and they were trying to say well, he was utilizing the cocaine that was transported, was cooked by, was possessed by, and had been, all the deals have been made through Corey Senior and Donald Turner, and in reality of fact, it's a chain of sale, or it's a chain of ownership of this product that they're trying to say somehow connects, in these two incidents, somehow connects Antonio Turner to the conspiracy. How many witnesses testified that your client had some direct involvement with other folks in the conspiracy? Jeronica Dorsey said there was none, and then Joe Lindsay Turner, who testified as well, and was the alleged ring co, was the alleged ring leader of this conspiracy, that turned state's evidence, testifies that prior to the initiation of this conspiracy, he had observed my client with marijuana in a case. This is a case concerning the cocaine. They also utilized another witness, and as Ashley... Did Joe Lindsay testify that he was giving cocaine, or that he, on occasion, delivered cocaine to your client? Joe Lindsay, to my knowledge, I don't believe he testified that he was delivering it. I think the accusations are the nexus drawing him into that. Any possession of cocaine through... He gave it to him for distribution purposes. I'm sorry? That it was given to him for distribution purposes. That there was some testimony that he had received some for distribution purposes, but if he had received some, Judge, and then he passed it and sold it on to another, that's not related by name Turner, then what connection do they have to a conspiracy? In other words, how... What is the dilution rate here that we're going to go to, that somebody is actually going to be part of a conspiracy? How much of their participation is required for them to be part of the conspiracy? I think the government had seen the weakness of this, and tried to buttress that connection by showing and putting on the testimony of Ashley Holland, who I must admit to you, it was an embarrassment to have him come into the court to testify. He had his hand wrapped in a bandage that was ridiculous, and he came and he couldn't even sit on the seat. He was so high, and I say that on the basis of 15 years of police work and 20 years as an attorney, I think I know when somebody is on some kind of medication that they're not supposed to be on. He had trouble sitting in the seat, had trouble admitting, I mean straight, had trouble speaking to the questions, and on cross-examination, he admitted to me on the videotaped by the head of Antonio Turner, he admitted that he told the officers that searched his car, and he was a paid informant, to go make the buy, that he did not have any drugs in the car, and of course upon my cross-examination, he admitted in fact he did have drugs in the car. They were located in the speaker area of his front seat of his car. You don't see any drugs changing hands from Antonio Turner to Ashley Holland, because they had a videotape stuck into the vehicle. You hear an audible clink, allegedly some cocaine dropped into a cup. You don't see anything. Your time's expired. I think we have your point. Thank you, Judge. Thank you. Okay, who's going first here? Mr. Judish? Morning. Good morning, Your Honor. May it please the Court, I'm Nathan Judish of the Department of Justice on behalf of the United States. I'm here today with my as an initial matter, I'm going to deal with the electronic evidence issues and leave the other issues to Mr. Willis. To begin, the government obtained the precise location information of Corey Turner's phone pursuant to a warrant that complied with both of the Fourth Amendment and the federal rules of criminal procedure. There is no authority and no reason whatsoever that the thing here is that we satisfied both the Wiretap Act and the Fourth Amendment and Rule 41 with respect to both the contents of the communications under the Wiretap Act and the location information we obtained pursuant to the warrant issued under the Section 2703 of Title 18 and Rule 41 of the federal rules of criminal procedure. The Tenth Circuit in the Bray-Harris case recognized that the same affidavit could be used to support probable cause for both a wiretap order and a precise location information order and that's exactly what we did in this case. And regarding the use of Section 2703, it is in fact an entirely appropriate authority for the government to rely on in obtaining prospective location information pursuant to a cell phone for several reasons. First, it's entirely consistent with the language of the statute to do so. The statute says that the government can require a provider of electronic communication service, here that's AT&T Wireless, to disclose information pertaining to a customer subscriber, here that's Corey Turner, when it obtains a warrant pursuant to the federal rules of criminal procedure, that is follows Rule 41, which is exactly what we did here. And you think that includes the prospective information? Yes, again the prospective information is information that pertains to a customer subscriber and that's exactly what the location information is. And it makes sense here because the distinction between the warrant here and a standard Rule 41 warrant is that with a standard Rule 41 warrant, when the government obtains it, it's entitled to execute it but nobody has to help the government in executing it. Most people have to stand aside and let the government go about the business of collecting the evidence which is identified in the warrant. But here when the government wants to obtain prospective location information, it needs an order directing the phone company's assistance and that's exactly what this purpose served by 2703 in this case. The government says that the statute says can obtain an order requiring the provider to disclose the information, which is what we did. In the absence of 2703, we would always have to rely on the All Writs Act in this sort of situation. But here where Congress has written and provided an appropriate authority for getting this sort of evidence, it's entirely appropriate to rely on it. But in any case, there's no problem from the point of Corey Turner. The government satisfied the Fourth Amendment and it followed the procedures of Rule 41. So there's really no basis for suppression for the location information. He says you didn't. Well we, I mean, we explained in detail in our fact did that if you look at that we went through the all the procedures in Rule 41 that he cited to, we explained why in fact our warrants, you know, that there's the things that you have to include in a warrant. And you're just saying that you did. We did include them, yes. And what about the reporting back? What's that? What about the, he claims as he did today that you didn't report back to the court. We did, Your Honor. Actually the day after the monitoring ended, we said that the court had, you know, which cited the exact dates that the monitoring had taken place. And with respect to Rule 41, that's what it says we're supposed to include in the return. You know, and we're supposed to say, you know, the period during which the monitoring took place. And that's, that was in our sealing application that we submitted to the court. We followed the that we made any kind of mistake. There'd be no cause for suppression in this case. We did not, you know, intentionally violate any rules where there's, and you know, as far as the Fourth Amendment goes, we believe we fully satisfied it. But there's certainly, we believe there's no basis under Leon to have suppression in this sort of circumstance. The only thing that Cory Turner has said is that our warrant was deficient on its face because of 2703. But that's not the kind of defect, if it were a defect, that Leon gets to. You know, the warrant is defective on its face under Leon if it fails, you know, in a significant way to satisfy the particularity clause with respect to what the warrant is targeted at. But here, the, you know, there's, I think there's no dispute that the warrant was quite particular and that identified the phone to be tracked and the period to be tracked of 30 days. And so there's no basis to suppress under Leon. You know, it's also worth noting, you know, I think as your Honor pointed out, that that Cory Turner wouldn't have any basis in any case to object to monitoring of other people's phones from their location, that Fourth Amendment rights are personal and can't be vicariously asserted. He has no privacy interest whatsoever in the location of Duane Wood's phone or Joe Lindsay Turner's phone. Maybe I should ask this of your co-counsel, but what evidence was obtained that was significant in this case as a result of the tracking or the GPS against Cory Turner? Should I? I prefer you to defer that, Your Honor, if you don't mind. So I will, if you have no more questions about location, I'll just make two quick points on the necessity argument of Donald Turner. First, we did in fact disclose to the court that the confidential source number one was a member of the Turner family. That's at page 90 of the government's appendix. That's part of our initial wiretap application. We also explained that Toby Turner was not an inner part of the Turner, of the drug dealing conspiracy, that he was a low-level purchaser and that he had no direct knowledge of the sources of supply. And under the controlling law regarding the necessity requirement of the Wiretap Act, the government is entitled to employ techniques which will determine the full scope and extent of the conspiracy. The district court's finding that that had been met is not clearly erroneous. And if you have no further questions, I'll turn the remaining of my time over to my colleague. Okay. Thank you. Excuse me. Thank you, Mr. Dudas. Mr. Willis. Thank you, Your Honor. Please the court. Again, my name is Tim Willis. I am one of the attorneys for the government in this manner. And if I may, I would start with this is an instance where there's a lot of complaining about the process. There's a lot of complaining about the PLI. But the defendants don't really point to any specific instance where they say, hey, because you got the PLI and it was improperly gathered, this evidence was seized or the police surveilled this meeting or you learned this essential fact. And in going back through the facts of this case, I really can't say with any specificity, oh, yeah, that seizure came about as a result of PLI on a particular telephone. I'm not aware of it. I really am not. And the defendants don't point that out. Their objection is one more of a just kind of a general, hey, we don't like the process you guys followed. You didn't do these documents separately as opposed to one combined document, which the government did. So I hope that answers Your Honor's question. To make a couple of comments, I'm going to kind of dovetail on what Mr. Judge has said about Toby Turner. If the court looks at the record, this is a very complex conspiracy. It spanned a long period of time. There were 17 defendants. There were a number of suppliers that floated in and out, depending on whether they were in jail or not. And the record is pretty clear that Toby Turner, even though he's one of a number of people in this conspiracy who's related, really wasn't that big of a fish. If you look at what Toby Turner was doing, Mr. Turner was buying basically quarter ounces, half ounces of cocaine off of his cousins, Cory Turner and Donald Turner. So even if the government wanted to further utilize him, that's going to be a very difficult thing to do, because you can't take somebody in a very closely knit conspiracy where these guys all know each other, they're related, the guys that they aren't related to, they've all grown up together, and suddenly have him say, hey, now I've got the money to buy pounds. That simply isn't going to work. So basically, the government, I think, used all the tools that we really had available that were likely to work prior to applying for the wiretaps. Now, counsel talked about Ms. Dorsey and her testimony in this case. A couple of things I'd like to point out in that. There's simply no evidence in here that the trial court abuses discretion by allowing Ms. Dorsey to testify. How was her testimony objected to? Your Honor, as I recall, they, I think, filed a motion eliminating, seeking to keep that out. Don't quote me on that. But they did object to her testimony at the time of trial. I think what's relevant are a couple of things. First of all, I mean, she is . . . But what was her objection? Her objection that she was a layperson and that she was given expert testimony? I mean, obviously under the rules, laypeople can get an expert testimony to a certain degree. But that, what was the objection? I think that, I think that was the objection, that basically they were concerned that she was going to use these these code words and these terms and somehow the jury was going to add extra weight to what she said. But what foundation was laid that she was capable of finding these terms? There's actually quite a foundation, Your Honor, in this case. Ms. Dorsey was an individual who knew these guys. She was intimately involved in the drug conspiracy. She was close friends with Corey Turner Sr. She ran with him. She saw him conduct hundreds of drug deals. She knew the other conspirators to a greater or lesser extent. She was party to lots of conversations. She understood not only the street lingo that everybody understands, but she also understood a couple of terms that were commonly used. If the district court had granted the motion to limit and suppress that testimony, would the wiretaps have been successful in securing conviction here? Would the jury have a basis for understanding the terminology used? Yes, Your Honor, actually they would. And I was about to bring that up. A lot of the terms that Ms. Dorsey talked about are terms that are common to the drug world, like fronting, eight-ball, quarter, hard, soft, things of that nature. Virtually all of the terms that she talked about in her testimony were talked about also by other witnesses and without objection. For instance, she defined the term fronting, basically getting drugs on credit. Toby Turner testified to that without objection. She talked about the term hitting licks, which was apparently something that Cory Turner used. It was his own personal slang phrase. She knew that because she was a very close intimate with him. But Joe Lindsay Turner also mentioned that, yeah, that's a term that Cory Turner Sr. uses. The term eight-ball was also defined by Joe Lindsay Turner. The term quarter, as in quarter ounce, was defined by Toby Turner. They talked about a rack or stack as being a $1,000 increment of bills. Joe Lindsay Turner talked about that. The term hard and soft, which are common for cocaine when it's in base form and when it's not. Both of those were testified to without objection by Task Force Officer Sullivan. The term clock, which is a reference to drug scales, again was testified to by Joe Lindsay Turner. So all those terms, I think, basically were allowed in without any objection on the part of the defendants anyway. How did they come in through Joe Lindsay Turner? Was he talking about someone else's conversation or his own? My recollection, Your Honor, is that Joe Lindsay Turner was obviously kind of the orchestrator of all this. There were a number of phone calls that were played that he was a party to or conversations that he was a party to. I believe that's where he defined those terms. But it's, I think it's something that, under all the circumstances, I don't think the court abuses discretion. And additionally, there was a instruction given to the jury as to this person's, you know, the fact that they're testifying, that they're cooperating in writtenness, that it's up to the jury to give this person whatever credence they wanted to give her. And with the conversations that were played, again, there was instruction that was given to the jury talking about, you know, hey, the evidence is actually what you hear on the call and not what this person thinks or believes that those terms might use. And the district court was very, very good about any instances of where he thought there might be an encroachment, that somebody might conclude that Ms. Dorsey was talking about somebody's state of mind, as opposed to what she understood that term to mean. So I think it's a good, clear record. I just don't see that as being an issue. What about the evidence against Antonio Turner? The evidence against Antonio Turner is interesting. Now, counsel wants to point him as being somebody who really, okay, he may have done a few drug deals, but he's really not a member of the conspiracy. And the record as a whole really shows that Mr. Antonio Turner is a plank holder in this conspiracy. He was there at the beginning when all this occurred. Joe Lindsey Turner was in the halfway house in March of 2009, and there's one instance that he testified about that while he was still there, Corey Turner came in to take your analysis, because he'd been released, and Antonio Turner came with him. And Mr. Fageras pointed out that Antonio Turner showed Joe Lindsey Turner some marijuana, which is so. But he neglects to mention that Antonio Turner also made mention that Corey Turner had a source for marijuana. That source had also given him two ounces of heroin. And what's pertinent to this is that Antonio Turner told Joe Lindsey Turner that Antonio was putting money in, sending money with Corey Turner to buy cocaine from a guy by the name of Maurice. So as early as March of 2009, Corey and Antonio were working in the drug trade. Now, when Mr. Joe Lindsey Turner was released from the halfway house in December 2009, it wasn't long before he started providing cocaine to Antonio Turner for one or two ounces at a time. Now, the law is clear that if the jury believes Mr. Joe Lindsey Turner's testimony, they can convict Antonio Turner of conspiracy. But there's a lot more evidence than that. What we have also is we have Ashley Holland, who maybe not the greatest witness in the world, but it's a drug case. He's a drug user. But Mr. Holland testified that Antonio Turner had been providing him with cocaine for a period of about a year. And there were three buys that were done where Mr. Antonio Turner sold cocaine to Ashley Holland that the Drug Task Force was able to, in fact, record. And we also have evidence that corroborates what Joe Lindsey Turner is saying. For instance, in fact, that was an order that Joe Lindsey Turner and Antonio Turner had placed. The police were doing surveillance. I think the wire was up at that point in time. And Antonio Turner had picked up a couple of ounces at Joe Lindsey Turner's car wash. Shortly after that, he was stopped. He was a passenger in a car. He was stopped by the Sykeson Department of Public Services. And he was arrested because they saw some cocaine in open view in the car. And as Mr. Antonio Turner's kind of arguing or struggling with the police, a bag of cocaine falls out of his pant leg. And that was on video. And that was played, the video portion, that was played for the jury. So there's quite a lot of evidence that inculcates him. In addition to what Joe Lindsey Turner said, the surveillance revealed, we also have the phone calls. And the phone calls, the one that I have a note of for Antonio Turner, is basically this coded conversation that they were talking, according to Joe Lindsey Turner, about an ounce of powder cocaine. So there's a lot of evidence that comes from several different sources that's corroborated by the surveillance, by the video, by the phone calls. So I don't think there's any real issue that Antonio Turner is a founding member and full participant in this particular conspiracy. I think that basically covers everything I had to say, unless Your Honors have questions. I'm down to about a minute. Yes, that's it. Thank you. Thank you, Your Honors. Appreciate it. I believe you're all out of time, but I'll give, if one of you wants to sum up, with one minute for everybody. Hey, Mr. Humphrey, you want to sum up for a rebuttal? Thank you. I know this isn't something that we necessarily got into previously, but it is a point and it is something that is critical, I know, to my client, is he wanted addressed about the enhancement in this case, because the enhancement in this case was filed on the Friday of trial in this matter, and that my client also wants it referenced that in light of the latest issues, including the the Holder memo, that he believes that an enhancement in this situation also to give a life sentence is extremely harsh. Mainly, Judge, in summation, we have an issue with a lot of sufficiency of evidence here. I know that a lot of it's been addressed as far as Antonio Turner, but specifically as far as making drug quantities and drug amounts in this case, there was only a finite amount of drugs that were actually seized, yet the government relies upon the testimony of Joe Lindsay Turner and Jeronica Dorsey in order to make their burden as far as a drug conspiracy of over five kilograms of cocaine. We believe that that is testimony that cannot be trusted and used almost exclusively to make that burden in this case. Okay, thank you, Mr. Humphrey. Well, we appreciate your arguments. I also appreciate your trying to accommodate the 20 minutes and squeeze it all in. I know it's difficult, but we will take it under advisement. We'll be